PEOPLE ex rel. LONG ACRE ELECTRIC LIGHT & POWER CO. v. PUB-
LIC SERVICE COMMISSION FOR FIRST DISTRICT OF
STATE OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department.   April 22, 1910.)

1. CORPORATIONS (§ 394*)—ISSUANCE OF SECURITIES—APPROVAL OF PUBLIC
   SERVICE COMMISSION.
   When application is made to the Public Service Commission to approve an issue of corporate securities, pursuant to section 69 of the public service commissions law (Laws 1907, c. 429), it may authorize the issue of what it deems reasonably required for the enumerated purposes, and refuse consent to the remainder.
   [Ed. Note.—For other cases, see Corporations, Dec. Dig. § 394.*]

2. ELECTRICITY (§ 4*)—ELECTRIC COMPANIES—EXERCISE OF FRANCHISE—CON-
   SENT OF PUBLIC SERVICE COMMISSION—"FRANCHISE."
   Section 68 of the public service commissions law (Laws 1907, c. 429), provides that no electrical corporation shall begin construction or exercise any right or privilege under any franchise hereafter granted, or under any franchise heretofore granted but not heretofore actually exercised, without first having obtained permission of the proper commission.   Held, that the word "franchise" as used therein refers to the secondary franchise or consent of the local authorities, and not to the primary franchise to be a corporation and do business as such, derived from the fact of incorporation.
   [Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4.*
   For other definitions, see Words and Phrases, vol. 3, pp. 2929-2942; vol. 8, p. 7666.]

3. ELECTRICITY (§ 4*)—ELECTRIC COMPANIES—EXERCISE OF FRANCHISE—CON-
   SENT OF PUBLIC SERVICE COMMISSION.
   An electric franchise owned by a corporation granted in 1887, and actually exercised by another company then owning it, by supplying electricity to customers in 1889 and 1890, when it was driven out of business, did not fall within either class of franchises referred to in such section 68 (Laws 1907, c. 429).
   [Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4.*]

4. ELECTRICITY (§ 4*)—ISSUANCE OF SECURITIES—APPROVAL OF PUBLIC SERV-
   ICE COMMISSION—"INCREASE."
   Section 12 of the gas commission law (Laws 1905, c. 737) provides that stock or bonds shall not be issued by any corporation hereafter incorporated which is subject to the supervision of the gas commission till the certificate of authority has been issued as required in the preceding section, and till the commission shall further certify in writing as to the amount of stock and bonds reasonably required for its purposes, and that no such corporation heretofore or hereafter incorporated shall increase its stock or bonded debt without the commission's written consent.   Held, as to an electrical corporation incorporated before 1905, that

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
   122 N.Y.S.—41

its initial issue of stock and bonds, not made till 1905, was not illegal because consent was not obtained, and that such consent was requisite only to an "increase" of stock or bonded debt.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4.*

For other definitions, see Words and Phrases, vol. 4, pp. 3515–3517; vol. 8, p. 7685.]

5. ELECTRICITY (§ 4*)—GAS (§ 6*)—COMPANIES—ISSUANCE OF BOND—APPROVAL OF PUBLIC SERVICE COMMISSION.

It is within the power of the Public Service Commission, on application under section 69 of the public service commissions law (Laws 1907, c. 429), relating to gas and electric companies, to authorize an issue of bonds for purposes clearly legal, and to refuse to authorize an issue. to take up original bonds whose validity is questioned.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4 ;* Gas, Dec. Dig. § 6.*]

6. CORPORATIONS (§ 394*)—ISSUANCE OF BONDS—APPROVAL OF PUBLIC SERVICE COMMISSION.

Objections to the approval by the Public Service Commission of an issue of bonds of an electric corporation in part to refund bonds already issued, that if bonds already issued are illegal the approval would authorize capitalization of a franchise, contrary to law, and that the new issue is too large as compared with the amount of voting stock, relates only to the use to which it is proposed to put a part of the issue, and affects only the question of how large an issue should be authorized, and does not support a refusal to authorize any issue at all.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 394.*]

7. CORPORATIONS (§ 394*)—ISSUANCE OF SECURITY—APPROVAL OF PUBLIC SERVICE COMMISSION.

Though a proposed contract by a corporation might be so obviously objectionable that the Public Service Commission would be justified in refusing its consent to an issue of securities to carry it out, an objection, unsupported by argument or proof, that a contract does not adequately protect the interests of the corporation or the public, does not present such a case.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 394.*]

8. ELECTRICITY (§ 4*)—ELECTRIC COMPANIES—PUBLIC POLICY AS TO COMPETITION—ISSUANCE OF SECURITIES.

The general policy of the state is to prevent competition in the business of electrical lighting. and encourage beneficent monopoly, the rights of the public and consumers being protected by the reserved right of the Legislature to regulate charges and methods of operation; but the right to determine whether such competition should be permitted, and when, rests with the Legislature, and has not been delegated to the Public Service Commission, as the public service commissions law (Laws 1907, c. 429) does not provide as to electrical companies for a certificate of necessity or convenience as it does in case of railroad companies, and section 68, which requires approval of the commission before electrical corporations may begin construction or exercise rights and franchises, merely requires that, before the approval certificate is issued, a certified copy of the charter shall be filed, with proof of the consent of municipal authorities, and section 69, requiring consent of the commission to an issue of stock or bonds, merely requires the commission to be satisfied that the money to be derived therefrom is reasonably required for corporate purposes, and hence objections to the approval of the issuance of such securities by an existing electrical company, based on the proposition that there should be no competition if a company already performs the service acceptably, are not valid.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4.*]

Ingraham, P. J., and McLaughlin, J., dissenting.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Certiorari by the People, on the relation of the Long Acre Electric Light & Power Company, against the Public Service Commission for the First District of the State of New York and others, to review an order of the commission denying relator's application for leave to issue stock and bonds. Writ sustained, the determination of the commissioners annulled, and relator's application referred back to the commission.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

J. S. L'Amoreaux, for relator.

George S. Coleman, for defendants.

SCOTT, J. This is a proceeding by certiorari to review the determination of the Public Service Commission, First District, denying an application of the relator for permission to issue stock and bonds, and to execute a mortgage of all of relator's properties, franchises, and rights. The purposes to which the relator seeks to apply the capital to be derived from the sale of the stock and bonds are set forth in its petition as follows:

"(a) To secure or retire the present issue of bonds. (b) The acquisition of property situate in the city of New York upon which to erect power houses and substations. (c) The construction of power houses and substations. (d) The purchase and laying of underground cables, paying for subsidiary connections and ducts. (e) The payment of corporate expenses in the conduct of its business."

The record presented by the return is very voluminous, and indicates that the commissioners arrived at their determination, which was wholly adverse to the relator, after a most careful and thorough examination into all the facts, and after patiently hearing every one who could show the slightest claim of interest in favor of or in opposition to the application. The determinative facts, although perhaps somewhat complicated, are not in dispute.

The relator was incorporated on April 24, 1903, and by its charter, as amended on June 7, 1907, it is authorized to generate and distribute electricity for light, heat, power, and other purposes in the boroughs of Manhattan and The Bronx. Until March 22, 1906, it held no secondary franchise or consent from the local authorities to place, construct, and use wires, conduits, and conductors for electrical purposes in, over, and under the streets of the city. On the last-mentioned date it acquired such a secondary franchise or consent, which had been granted in May, 1887, to a corporation known as the American Electric Manufacturing Company. The devolution of the title to this secondary franchise has already been passed upon by this court and the Court of Appeals, and it is unnecessary to restate it here. Matter of Long Acre Electric L. & P. Co., 117 App. Div. 80, 102 N. Y. Supp. 242; Id., 188 N. Y. 361, 80 N. E. 1101. The result of these decisions was to affirm the title of relator to the said secondary franchise, subject only to avoidance, if at all, by the state or city. Being thus legally entitled to pursue the business for which it was incorporated, the relator applied to the Public Service Commission for leave to issue

stock and bonds for the purposes above stated. The application was made under the provisions of section 69 of the public service commissions law (chapter 429, Laws 1907), which provides as follows:

"A gas corporation or electrical corporation organized or existing or hereafter incorporated under or by virtue of the laws of the state of New York, may issue stocks, bonds, notes or other evidence of indebtedness, payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property, the construction, completion, extension or improvement of its plant, or distributing system, or for the improvement or maintenance of its service, or for the discharge or lawful refunding of its obligations, provided and not otherwise that there shall have been secured from the proper commission an order authorizing such issue, and stating that, in the opinion of the commissioners the use of the capital to be secured by the issue of such stocks, bonds, notes or other evidence of indebtedness is reasonably required for the said purposes of said corporation."

The relator, being an electrical corporation organized and existing before the passage of the foregoing act, was entitled to apply for the approval of the commission to its proposed issue of stock and bonds, and the purposes for which it desired to make such issue were within those specified in the act. The commissioner who heard the application in behalf of the commission made a long report, which was adopted and approved by the commission, and in which 10 reasons were assigned why the application should be denied in toto. They were as follows:

"(1) No certificate to begin construction has been obtained from this commission or its predecessor, the Commission of Gas and Electricity. (2) It is probable that the bonds already issued are illegal, and there is grave doubt of the legality of the stock; neither issue having been approved by the Commission of Gas and Electricity. (3) It is doubtful whether the title of the Long Acre Company to the franchise which it claims is perfect. (4) If the bonds already issued are illegal, the approval of the application would authorize the capitalization of a franchise, which is contrary to law. (5) The amount of bonds of the new issue is very much too large as compared with the amount of voting stock. (6) The construction contract does not adequately protect the interests of the Long Acre Company or of the public. (7) The applicant has not proved that the existing companies are not properly conserving the public interest and convenience, and that it would be to the advantage of the community to have a new company authorized to enter the field. (8) If a competing company were allowed to begin operation, it is not likely that it would continue to operate independently for any considerable period. (9) Competition would cause inconvenience and expense to the public, would cause duplication of plant, would lead to waste, and ultimately be urged as a reason why rates should not be reduced to consumers. (10) Practically all of the advantages claimed by the applicant as to the probable results of competition can be secured through the powers of this commission, and until it has been demonstrated that these are ineffective it would be unwise to adopt a method which has proved to be ineffective in the past."

Before proceeding to consider these reasons in detail, it may be useful to consider the extent of the authority given by the statute to the Public Service Commission with respect to the issue of corporate securities. The certificate of opinion required to be made by the commission in authorizing such an issue is to be that:

"The use of the capital to be secured by the issue of said stock, bonds, notes, or other evidence of indebtedness is reasonably required for the said purposes of said corporation."

The Court of Appeals has recently had occasion to define the duties and powers of the commission under section 55 of the public service commissions act, which is identical with section 69, except that it applies to common carriers and railroad corporations, instead of gas and electrical corporations. People ex rel. D. & H. Co. v. Stevens, 197 N. Y. 1, 90 N. E. 60. In that case the court said:

"We understand that the paramount purpose of the enactment of the Public Service Commission law was the protection and enforcement of the rights of the public. * * * For a generation or more the public has frequently been imposed upon by the issue of stocks and bonds of public service corporations for improper purposes, without actual consideration therefor, by company officers seeking to enrich themselves at the expense of innocent and confiding investors. One of the legislative purposes in the enactment of this statute was to correct this evil by enabling the commission to prevent the issue of such stock and bonds, if, upon investigation of the facts, it is found that they were not for the purposes of the corporation enumerated by the statute and reasonably required therefor."

It would seem to follow (and this I understand is not questioned) that the commission, when application is made to it to approve of an issue of securities, is not obliged to consent or refuse consent to the whole application as presented, but may authorize the issue of such securities as it deems to be reasonably required for the enumerated purposes of the corporation, and refuse its consent to the remainder of the issue desired to be made. The court in the case cited further said:

"We do not think that the legislation alluded to was designed to make the commissioners the financial managers of the corporation, or that it empowered them to substitute their judgment for that of the board of directors or stockholders of the corporation as to the wisdom of a transaction; but that it was designed to make the commissioners the guardians of the public, by enabling them to prevent the issue of stock and bonds for other than statutory purposes."

The purposes for which the relator seeks to issue its stock and bonds are all within the purposes enumerated by statute, unless, for reasons to be hereinafter discussed, the refunding of outstanding bonds is without the statute. The question before the commission, therefore, was whether or not the issues sought to be made, or any part thereof, were reasonably necessary for such purposes.

We may now proceed to consider in detail the reasons assigned by the commission for wholly denying the application of the relator.

The first reason is:

"That no certificate to begin construction has been obtained from this commission or its predecessor, the Commission of Gas and Electricity."

This objection requires a reference to the Gas Commission act of 1905 (chapter 737). Before the passage of that act, any corporation having a charter from the state and the consent of the city could commence and carry on the electric lighting business. By section 11 of the act of 1905 it was provided that any corporation "hereafter incorporated" for lighting purposes might not exercise any power or transact any business until it had obtained a permit from the Gas Commission created by the act. The relator was not covered or affected by this

section, because it was incorporated before 1905. By section 81 of chapter 429, Laws 1907, the powers and duties of the so-called Gas Commission were transferred to the Public Service Commission, and section 68 of the act provides as follows:

"No gas corporation or electrical corporation incorporated under the laws of this or any other state shall begin construction, or exercise any right or privilege under any franchise hereafter granted, or under any franchise heretofore granted but not heretofore actually exercised, without first having obtained the permission and approval of the proper commission."

It is quite apparent from an examination of this section and of section 70 that the word "franchise" as used in these sections refers to the secondary franchise or consent of the local authorities, and not to the primary franchise to be a corporation, and carry on business as such, derived from the fact of incorporation. It will be seen that the section above quoted refers to two classes of franchises under which construction cannot be begun or rights exercised without the permission and approval of the commission—viz. (1) franchises hereafter granted; and (2) franchises heretofore granted, but not heretofore actually exercised. The relator's franchise does not fall within the first class, having been granted in 1887. Does it fall within the second class? It appears from the evidence and the report of the commissioner who reported upon the application that the American Electric Illuminating Company, the first owner of the franchise, actually exercised it, and supplied electricity to customers in 1889 and 1890, when it was practically driven out of business by the abolition of overhead wires in the city of New York. So the franchise under which the relator seeks to operate its business did not fall within the class of franchises "not heretofore actually exercised." We think, therefore, that the first reason given for denying the relators' application is untenable.

The second reason is:

"It is probable that the bonds already issued are illegal, and there is grave doubt of the legality of the stock; neither issue having been approved by the Commission of Gas and Electricity."

This reason calls for the consideration of section 12 of the Gas Commission act of 1905 (chapter 737), which reads as follows:

"Sec. 12. Stock or bonds shall not be issued by any corporation hereafter incorporated which is subject to the supervision of the commission, until the certificate of authority has been issued as required in the preceding section, and until such commission shall further certify in writing as to the amount of stock and bonds reasonably required for the purposes of the corporation. Stock and bonds of the corporation shall not be issued in excess of the amount so certified. Any such corporation heretofore or hereafter incorporated shall not increase its capital stock or its bonded indebtedness without the consent in writing of such commission, stating the amount of the authorized increase."

This section provides for two classes of corporations, viz., those "hereafter incorporated" and those "heretofore or hereafter incorporated." As to the first class, within which the relator does not fall, no issue of stock or bonds could be issued without consent of the commission. This, of course, includes an initial issue, as well as an

increased issue. As to the second class, within which the relator does fall, the consent of the commission is requisite only to an "increase" of capital stock or bonded indebtedness, which of course implies that there must have been an initial issue to be increased. Although the relator was incorporated before 1905, its initial issue of stock and bonds was not made until 1905. By the letter of the statute above quoted, the relator, having been incorporated before 1905, required no consent from the Gas Commission for its initial issue of securities, and such issue cannot be said to be illegal because no consent therefor was obtained. The argument to the contrary, as urged by the learned counsel to the commission, is that it was the evident purpose of the Legislature to forbid all further issues of stock or bonds without the consent of the Gas Commission, and that the reason for the peculiar wording of the section, which appears to relieve the relator from the necessity of obtaining consent for its initial issue, is that it was not contemplated that any corporation organized before the passage of the act would not have issued stock or bonds before that time. The question is not a vital one at present. The bonds which it is desired to issue for the purpose of refunding the bonds now said to be illegal constitute but a fraction of the whole proposed bond issue, and it is within the power of the commission to authorize the issue of bonds for purposes clearly legal, and to refuse to authorize an issue to take up the original bonds, the validity of which is questioned. That question can then be passed upon by itself.

The same considerations apply to the fourth reason, which is:

"If the bonds already issued are illegal, the approval of the application would authorize the capitalization of a franchise, which is contrary to law."

Both of these last-mentioned reasons relate only to the use to which it proposed to put a part of the bond issue, and affect only the question as to how large an issue should be authorized, and do not support a refusal to authorize any issue at all.

The same may be said of the fifth reason, which is:

"That the amount of bonds of the new issue is very much too large as compared with the amount of voting stock."

The third reason, that—

"it is doubtful whether the title of the Long Acre Company to the franchise which it claims is perfect"

—is answered by the decision of this court and the Court of Appeals, above referred to, and is abandoned by counsel for the respondent upon his brief.

The sixth reason for refusing consent to the issue of any securities at all is that:

"The construction contract does not adequately protect the interests of the Long Acre Company or the public."

The assignment of this reason indicates a disposition on the part of the commission to do precisely what the Court of Appeals has said that they are not authorized to do, viz.:

"To substitute their judgment for that of the board of directors or stockholders of a corporation as to the wisdom of a transaction."

We do not, of course, mean to be understood as saying that a case might not occur wherein a proposed contract by a corporation was so obviously objectionable that the commission would be justified in refusing its assent to an issue of securities to carry it out. But no such case is presented here. The objection to it seems to be wholly arbitrary, and is unsupported by any argument in the report to the commission or on the brief of counsel. Our own examination discloses nothing apparently so objectionable as to warrant condemnation.

This brings us to the last four reasons, which are elaborately argued in the commissioners' report, and which, if valid, justify the refusal to approve any issue of securities at all. They are the following:

"(7) The applicant has not proved that the existing companies are not properly conserving the public interest and convenience, and that it would be to the advantage of the community to have a new company authorized to enter the field. (8) If a competing company were allowed to begin operation, it is not likely that it would continue to operate independently for any considerable period. (9) Competition would cause inconvenience and expense to the public, would cause duplications of plant, would lead to waste, and ultimately be urged as a reason why rates should not be reduced to consumers. (10) Practically all of the advantages claimed by the applicant as to the probable results of competition can be secured through the powers of this commission, and until it has been demonstrated that these are ineffective it would be unwise to adopt a method which has proved to be ineffective in the past."

These reasons for refusing consent to the issue of stock and bonds are fundamental, and go to the extent of holding that the relator, although authorized by its charter and franchise to manufacture and distribute electricity, should not be permitted to do so; because it is manifest that if it may not issue any stock and bonds at all it cannot exercise its corporate rights and franchises. These reasons are all based upon the underlying proposition that there should be no competition in the business of electrical lighting, providing that there is to be found to be one company already performing that service acceptably. It it said that it is the general policy of the state to prevent such competition, and to encourage in such matters beneficent monopoly; the rights of the public and the consumers being protected by this reserved right of the Legislature to regulate charges and methods of operation. That such has been the general policy of the state is undoubted. Matter of Attorney General, 124 App. Div. 401–406, 108 N. Y. Supp. 823; People ex rel. N. Y. Elec. Lines Co. v. Ellison, 188 N. Y. 523–531; 81 N. E. 447. In the case last cited the grounds upon which this general policy rests are clearly pointed out. The right to determine whether such competition should be permitted, and when, rests, however, with the Legislature, and has not been delegated to the Public Service Commission. The relator had acquired legislative authority to transact its business before the commission was created, and we can find nothing in the act which permits the commission to say, upon its own mere ipse dixit, that a duly chartered and authorized corporation may not transact business merely because it may compete with another corporation engaged in the same business. Upon this question it is interesting and significant to note

the difference in the powers granted to the commission respecting railroad corporations and those respecting gas and electrical corporations. By section 53 of the act, railroad corporations, street railroad corporations, and common carriers, who had not before the creation of the Public Service Commission obtained a consent from the board of railroad commissioners, or who had not then become entitled to begin construction by virtue of compliance with the railroad law, are forbidden to begin the construction of a railroad or an extension thereof without first having obtained the permission and approval of the proper Public Service Commission; and such permission is to be given only after the commission has determined "that such construction or such exercise of the franchise is necessary or convenient for the public service." Under this provision, it seems that the commission could properly withhold its permission if the proposed railroad appeared to be unnecessary, because the territory to be served was already sufficiently served by an existing line of railway. People ex rel. Potter v. Board of Railroad Commissioners, 124 App. Div. 47, 108 N. Y. Supp. 288; People ex rel. D. & H. Co. v. Board of Railroad Commissioners, 126 App. Div. 492, 110 N. Y. Supp. 862. The provisions regarding gas and electrical companies are quite different, and provide for no certificate of necessity or convenience. Section 68, which requires the approval of the commission before certain gas and electrical corporations may begin construction or exercise rights and franchises, merely requires that, before such certificate of approval is issued, a certified copy of the charter of the corporation shall be filed in the office of the commission, together with proof that it has obtained the required consent of the proper municipal authorities. Section 69, requiring the consent of the commission to an issue of stock or bonds of a gas or electrical corporation, merely requires that the commission shall be satisfied that the money to be derived from such issue is reasonably required for the enumerated purposes of the corporation. The specific requirement of a certificate of "necessity and convenience" in the case of a railroad company, and the omission of any such requirement in the case of a gas and electrical corporation, indicates that, as to the latter, it was not the intention of the Legislature to delegate to the commission the power to prevent the exercise of corporate rights, merely because such exercise would involve competition. The last four reasons, therefore, rest upon a mistaken view as to the scope of the commission's authority, and are consequently insufficient.

It will be seen that the reasons given by the commission for withholding its approval to the relator's application divide themselves into two classes. The first class comprises those which go to the question whether any securities at all should be issued. These we find to be inadequate. The second class comprises those which relate to the question as to what amount of securities should be permitted to be issued, and to what purposes their proceeds should be applied. These questions the commission has not undertaken to decide, relying upon the supposed force of their objections to any issue at all.

It follows that the writ should be sustained and the determination of the commissioners annulled, with $50 costs and disbursements, and

the relator's application referred back to the commission, for consideration and action within the limits of its authority.

CLARKE and DOWLING, JJ., concur.

INGRAHAM, P. J. I dissent. I expressed my opinion as to the right of the relator to exercise this franchise in my dissenting opinion in 117 App. Div. 92, 102 N. Y. Supp. 242. I do not understand that the right of the relator to exercise this franchise was passed upon by the Court of Appeals upon the appeal to that court reported in 188 N. Y. 364, 80 N. E. 1101, except so far as it held that objections could be taken by the people or the city and not by the defendant in that proceeding. The Public Service Commission, the defendants here, are a commission organized by the state as what the Court of Appeals calls "the guardians of the public," to prevent the issue of stock for other than statutory purposes. People ex rel. D. & H. Co. v. Stevens, 197 N. Y. 1, 90 N. E. 160. It is the state that is now being proceeded against, to compel its officials, with whom it has vested certain discretionary powers, to consent to the exercise by the relator of such powers; and it seems to me that, if the state has a right to question the right of the relator to this franchise, or its right to use the franchise, the defendants as state officers had such right. Entertaining the views I formerly expressed in 117 App. Div. 92, 102 N. Y. Supp. 242, and which have been confirmed by a subsequent examination, I do not think this court should reverse the determination of the defendants.

I also disagree with the opinion of Mr. Justice SCOTT as to the necessity of this corporation obtaining a certificate from the defendants of their predecessor, the commissioner of gas and electricity, before it could exercise any right or privilege under the franchise heretofore granted by the state and the city of New York. It is apparent that this franchise has never been actually exercised. A pretended use of the streets for a short period many years ago over a small territory does not, I think, bring this case within section 81 of the public service law (chapter 429, Laws 1907). Whatever franchise the American Electric Illuminating Company claimed to have had in 1889 or 1890, it then abandoned any attempt to exercise a franchise, and for 20 years has been practically extinct. It seems to me to be a violation of the spirit as well as the letter of this statute to claim that such a franchise can be revived after such a period of time, and allow the exercise of the powers then granted without the consent of the defendants.

I also think that the second reason assigned by the commissioners justified them in refusing this consent. I think the bonds already issued, and which this issue is to be used to retire, was clearly illegal, not issued for any corporate purpose, and for which the corporation received no real consideration. It is quite clear that the stock of this alleged corporation was issued without real consideration, and has never been approved by the commissioner of gas and electricity or this defendant. Here is a corporation without property, with a franchise the legality of which is doubtful, with stocks and bonds that

have been issued that are at least of doubtful validity, asking to be allowed to issue $50,000,000 of bonds and $10,000,000 of stock without really showing that it is practicable to use any of this stock and bonds in the working of its franchise or providing for the necessary property therefor.   It seems to me that this provision of the public service commissions law which provided that the consent of the commission must precede the issue of any stock or bonds of a public service corporation was designed to prevent the issue of such stock and bonds as are here asked for, and upon the proceedings before the commission no necessity appeared that required them to consent to such issue; except to take up a series of bonds, which, as I look at it, were clearly issued without benefit to the corporation.   If the relator should present a case to the commission by which it would appear that the issue of a reasonable amount of bonds or stock would be necessary for the proper exercise of the relator's franchise, a different question would be presented; but as it stands I think this application was properly denied.

McLAUGHLIN, J., concurs.